UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COLOR OF CHANGE and CENTER FOR CONSTITUTIONAL RIGHTS,<br><br>　　　　　　　　　　Plaintiffs,<br><br>　　　　　　v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and FEDERAL BUREAU OF INVESTIGATION,<br><br>　　　　　　　　　　Defendants. | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

　　　　1.　　　　This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. §§ 552 *et seq*., seeking declaratory, injunctive, and other appropriate relief to compel the Defendants, the United States Department of Homeland Security ("DHS") and the Federal Bureau of Investigation ("FBI") (collectively "Defendants"), to produce agency records that have been improperly withheld from Plaintiffs, Color of Change ("COC") and the Center for Constitutional Rights ("CCR") (collectively "Plaintiffs").

　　　　2.　　　　Plaintiffs' submitted a FOIA request to Defendants on July 5, 2016, seeking records related to federal government surveillance and monitoring of protest activities related to the Movement for Black Lives ("MBL"). *See* July 5, 2016 FOIA Request Letter from COC and CCR ("Request"), attached as Exhibit A.  The Request documented the compelling and urgent need for public disclosure of information related

1

to federal responses to public protests. Plaintiffs' sought expedited processing and a fee waiver.

3. Police violence, criminal justice, and racial inequity are now the subjects of an impassioned national, political debate. MBL has played a significant role in bringing this discussion to the forefront by holding demonstrations in cities throughout the country, often in response to deadly police shootings of Black people.

4. Government documents, news reports, and first-hand accounts demonstrate that Defendants and state and local law enforcement agencies ("LEAs") have engaged in the surveillance and monitoring of MBL demonstrations and individual activists aligned with the movement.

5. Surveillance undertaken by Defendants and LEAs to monitor MBL activities has relied on tactics and measures commonly reserved for counterterrorism and national security related purposes.

6. Monitoring MBL's legitimate protest activities with the same surveillance methods used to target and disrupt potential terrorists undermines the First Amendment's robust protection of political speech. Specifically, Defendants' surveillance and monitoring practices chill valuable public debate about police violence, including the use of deadly force, criminal justice, and racial inequities.

7. Surveillance and monitoring of MBL protesters and leaders' activities also may impinge on their reasonable expectations of privacy in violation of the Fourth Amendment.

8. The public has a vital interest in knowing the nature and extent of Defendants' surveillance of constitutionally protected speech and expression. Desire for secrecy should not shield potential constitutional violations.

9. Under FOIA, the public has a statutory right to records relating to Defendants' surveillance of MBL, including its activists and leaders, in order to assess whether they are legitimate.

10. Plaintiffs bring this action to compel Defendants to release records responsive to Plaintiffs' Request.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties under 5 U.S.C. § 552(a)(4)(B). This Court also has jurisdiction under 28 U.S.C. §§ 1331 and 1346(a)(2).

12. Venue is proper under 5 U.S.C. § 552(a)(4)(B), 28 U.S.C. §§1391(e) and 1402(a) because COC and CCR reside in this district.

13. Because the Defendants have failed to comply with the time limits imposed by FOIA, Plaintiffs have exhausted their administrative remedies. 5 U.S.C. § 552(a)(6)(C)(i). Plaintiffs are therefore entitled to appeal directly to this Court for relief. 5 U.S.C. § 552(a)(4)(B).

## PARTIES

14. Plaintiff COC is a nonprofit civil rights advocacy and communications organization within the United States. COC and its website www.ColorofChange.com seek to strengthen Black America's political voice and its mission is to empower its members to make the government and corporations more responsive to the concerns of

3

Black Americans. COC seeks to bring about positive political and social change for everyone. By and through the Internet, public events, and advertisements calling for the news media to cover highlighted issues, COC aims to keep the public informed about the most pressing issues for Black Americans and gives them a way to act.

15. Plaintiff CCR is a New York-based nonprofit legal and public education organization that engages in litigation and public advocacy. CCR regularly publishes informational materials to raise public awareness in the fields of civil rights, and domestic and international human rights through its dedicated Development, Communications, and Legal & Advocacy Departments and staff. CCR also disseminates information through CCR's website, http:// ccrjustice.org, and through social media platforms.

16. Defendant DHS is a Department of the Executive Branch of the United States Government and is an "agency" within the meaning of 5 U.S.C. § 552(f)(1). DHS is tasked with, among other things, preventing terrorist attacks and safeguarding the border and cybersecurity.

17. Defendant FBI is a component of the United States Department of Justice ("DOJ"). DOJ is a Department of the Executive Branch of the United States Government and is an "agency" within the meaning of 5 U.S.C. § 552(f)(1). The FBI is tasked with, among other things, protecting against terrorist and foreign intelligence threats and providing leadership and criminal justice services to local law enforcement.

## STATEMENT OF FACTS

### Background on the Movement for Black Lives

18. On August 9, 2014, 18-year-old Michael Brown was shot and killed by Darren Wilson, a police officer in Ferguson, Missouri. For weeks after Michael Brown's death, thousands took to the streets to protest police violence and to demand racial justice.

19. The public outcry in response to Michael Brown's death transformed MBL into a movement with national scope and influence. Since August 2014, in response to more high-profile killings of Black people by police officers, MBL has continued to draw public attention to police violence and to advocate for policing reform and racial justice.

20. Among other constitutionally protected strategies, concerned citizens and organizers with MBL have protested publicly, held vigils, and demonstrated. Indeed, over 1000 MBL demonstrations were held throughout the United States in the last two years. *11 Major Misconceptions about the Black Lives Matter Movement*, Blacklivesmatter.com, available at http://blacklivesmatter.com/11-major-misconceptions-about-the-black-lives-matter-movement/ (last visited Oct. 19, 2016).

21. Through these actions, MBL has made issues of police violence, criminal justice, and racial inequity a priority in national dialogue and policy discussions.

### Nationwide Surveillance of Movement for Black Lives Activities

22. Immediately following the killing of Michael Brown, the Federal Emergency Management Agency ("FEMA") tracked social media usage to monitor the protests in Ferguson. DHS also shared information with LEAs as vigils commemorating

Michael Brown spread to other major cities throughout the United States. *See* George Joseph, *Exclusive: Feds Regularly Monitored Black Lives Matter Since Ferguson*, The Intercept (July 24, 2015), available at https://theintercept.com/2015/07/24/documents-show-department-homeland-security-monitoring-black-lives-matter-since-ferguson/ (last visited Oct. 19, 2016).

23. In 2015, *The Intercept* obtained documents through FOIA demonstrating that, as early as August 2014, Defendants and local LEAs had begun routinely surveilling and sharing information about MBL protests. *Id.*

24. Publicly disclosed DHS reports reveal substantial coordination between Defendants and local LEAs in the surveillance of MBL activities through facilities known as fusion centers. Following arrests of MBL demonstrators in Boston in November 2014, reports surfaced that local LEAs prepared for the protests by monitoring MBL-related social media posts at the Commonwealth Fusion Center, a facility that provides "information sharing among local, state and federal public safety agencies and private sector organizations . . . of intelligence relevant to terrorism and public safety." Commonwealth Fusion Center, Mass.gov, available at http://goo.gl/KL7uLr (last visited Sep. 24, 2016).

25. Press reports describe how the New York Police Department, the Metropolitan Transit Authority's counterterrorism unit, and the FBI's Joint Terror Task Force coordinated efforts to surveil protests against police violence that took place in New York. *See* Alex Kane, *How the NYPD's Counterterrorism Apparatus is Being Turned on Protestors*, Vice (Jan. 18, 2015), available at http://goo.gl/XGyybG (last visited Oct. 19, 2016); George Joseph, *Undercover Police Have Regularly Spied on*

*Black Lives Matter Activists in New York*, The Intercept (Aug. 18, 2015), available at http://goo.gl/KFMmU3 (last visited Oct. 19, 2016).

26. Activists in Chicago uncovered evidence that the Chicago Police Department used cell-phone interceptor (or "Stingray") technology to surveil MBL protests in 2014. *See* Mike Krauser, *Activists Say Chicago Police Used "Stingray" Eavesdropping Technology During Protests*, CBS Chicago (Dec. 6, 2014), available at http://goo.gl/BvCfBB (last visited Oct. 19, 2016).

22. In April 2015, California Highway Patrol emails revealed that it had coordinated with the California State Threat Assessment Center—another fusion center coordinating intelligence about criminal and terrorist activity among local, state, and federal LEAs—to monitor the social media accounts of MBL protesters. *See* Darwin Bond Graham, *Counter-Terrorism Officials Helped Track Black Lives Matter Protesters*, East Bay Express (Apr. 15, 2015), available at http://goo.gl/xLQBFV (last visited Oct. 19, 2016).

27. That same month, DHS's Network Operations Center advised that it was monitoring "protest" activities in Baltimore, citing social media as the source of information about the events. These activities included a Funk Parade, a breast cancer awareness walk, and a community parade in the historically Black Congress Heights neighborhood. *See* George Joseph, *Exclusive: Feds Regularly Monitored Black Lives Matter Since Ferguson*, The Intercept (July 24, 2015), available at http://goo.gl/AatBmP (last visited Oct. 19, 2016).

28. In August 2015, journalists disclosed a report by a Baltimore cyber-security firm ZeroFox, which has coordinated on briefings with the FBI, that identified a

7

prominent activist associated with MBL as a "threat actor" requiring "continuous monitoring" to ensure public safety. Brandon Ellington Patterson, *Black Lives Matters Organizers Labeled as "Threat Actors" by Cybersecurity Firm*, Mother Jones (Aug. 3, 2015), available at http://goo.gl/ZlDZhu (last visited Oct. 19, 2016).

29. In April 2016, the Oregon Department of Justice ("ODOJ") released a report detailing the use of social media to track MBL activity by its Criminal Intelligence Unit, the division that houses Oregon's TITAN Fusion Center. Using social media monitoring software, an ODOJ official ran keyword searches on the terms "#blacklivesmatter" and "#fuckthepolice." Oregon's Attorney General ordered an investigation into the use of the software after a top civil rights lawyer within ODOJ was himself identified as a possible threat to law enforcement based only on the keyword search results. *See* Denis C. Theriault, *Black Lives Matter: Rap Group Logo Helped Spark Racial Profiling Scandal*, Oregon Live (Apr. 11, 2016), available at http://goo.gl/Wi2zCw_(last visited Oct. 19, 2016).

30. In July 2016, DHS and FBI agents visited MBL activists and community organizers in Cleveland prior to the Republican National Convention. Agents questioned activists about their plans, sending the unnerving message that Defendants were monitoring individual activists and would surveil protests. *See* Alice Speri, *FBI and Police are Knocking on Activists' Doors Ahead of Republican National Convention,* The Intercept (June 23, 2016), available at http:// goo.gl/E1Y2Cl (last visited Oct. 19, 2016).

31. DHS Secretary Jeh Johnson has openly acknowledged the extensive coordination between DHS and local LEAs.  In an interview in July 2016, he discussed DHS's role in ensuring uniform LEA responses to protest activity, highlighting grants

provided by DHS for surveillance, communications, and training at federal law enforcement centers. *See* Daniella Diaz, *DHS Secretary Jeh Johnson Backs Local Law Enforcement, Says Tactics Should be Reviewed*, CNN (July 10, 2016), available at http://http://www.cnn.com/2016/07/10/politics/jeh-johnson-dallas-shooting-reaction-reaction/ (last visited Oct. 19, 2016).

32. In August 2016, the FBI responded to a separate FOIA request by the American Civil Liberties Union (ACLU) and the Baltimore Sun and released surveillance footage collected in Baltimore in 2015. The footage included video recorded by FBI aircraft conducting surveillance flights over Baltimore during MBL protests. *See* Kevin Rector, *FBI Releases 'Complete Collection' of Surveillance Videos from Baltimore Protests, Unrest*, The Baltimore Sun (Aug. 4, 2016), available at http:// goo.gl/TqJOCe (last visited Oct. 19, 2016).

33. In October 2016, the ACLU confirmed that LEAs have used social media surveillance software to monitor activists and protesters. Documents released to the ACLU of California revealed that a number of LEAs relied on Geofeedia, a company that provided real-time data pulled from protestors' social media feeds, to track protests in Ferguson and Baltimore following the deaths of Michael Brown and Freddie Gray. Facebook, Twitter, and Instagram have since blocked Geofeedia's access to their specialized data streams after the publication of reports regarding the company's relationship with LEAs. *See* Craig Timberg & Elizabeth Dwoskin, *Facebook, Twitter and Instagram Sent Feeds that Helped Police Track Minorities in Ferguson and Baltimore, Report Says*, The Washington Post (Oct. 11, 2016), available at http://goo.gl/Bbwi2b (last visited Oct. 19, 2016).

**Continuing Police Violence and Protests Accentuate
the Urgency of Plaintiffs' Request**

34.     In the months since Plaintiffs filed their Request, issues of police violence, criminal justice, and racial inequities have continued to garner national attention. An estimated 35 Black people were killed by police in August and September 2016 alone. *See The Counted*, The Guardian: Blog, https://www.theguardian.com/us-news/ng-interactive/2015/jun/01/the-counted-police-killings-us-database (last visited Oct. 7, 2016). The fatal police shootings of Terence Crutcher in Oklahoma and Keith Scott in North Carolina in September 2016 have generated massive media coverage, prompted renewed protests, and elicited commentary from presidential candidates. *See* Liam Stack, *Video Released in Terence Crutcher's Killing by Tulsa Police*, New York Times (Sep. 19, 2016), available at http://goo.gl/iZI1kL (last visited Oct. 19, 2016); Alan Smith, *Hillary Clinton and Donald Trump Respond to Police Shootings in North Carolina and Oklahoma*, Business Insider (Sep. 21, 2016), available at http://goo.gl/ph4Fxj (last visited Oct. 19, 2016).

35.     Reports of Defendants' monitoring and surveillance of MBL activists and protests raise concerns that Defendants are targeting First and Fourth Amendment-protected activities based on race and political viewpoints in order to chill dissent.

36.     The reported monitoring and surveillance recalls the U.S. government monitoring and surveillance of another generation of Black activists, including the Black Panther Party and Martin Luther King Jr., the revelations of which led to legal restrictions on domestic surveillance and increased oversight.

37.     As the nation engages in critical discussions about police violence, criminal justice, and racial inequity, it is imperative for the public to understand the

extent to which Defendants are surveilling the very movement and individuals that have pushed this discourse into the spotlight.

### Plaintiffs' FOIA Request

38. On July 5, 2016, Plaintiffs submitted their Request in accordance with 5 U.S.C. §§ 552 *et seq*. to Defendants DHS and FBI. *See* Exhibit A.

39. Plaintiffs requested information regarding policies and actions involving the monitoring and surveillance of public protests surrounding police violence, criminal justice, racial inequities, and the Movement for Black Lives.

40. Plaintiffs also requested records related to protests whose subject matter or theme involved police violence, criminal justice, racial inequities, or MBL ("Relevant Protests"). The requested records include communications and records concerning surveillance of the Relevant Protests and its participants by and between Defendants and LEAs in the jurisdiction of the Relevant Protests.

41. Plaintiffs sought expedited processing of the Request under 5 U.S.C. § 552(a)(6)(E)(i)(I), because there is a "compelling need" to inform the public of the policies and decision-making regarding government involvement in surveillance and monitoring of peaceful protestors, activists, and organizers.

42. Plaintiffs sought a fee waiver on the basis that "disclosure of the requested materials is in the public interest because it is likely to contribute significantly to the public understanding of the activities or operations of the government and is not primarily in the commercial interest" of the Plaintiffs. 5 U.S.C. § 552(a)(4)(A)(iii).

43. Plaintiffs also sought the fee waiver on the basis that Plaintiff COC constitutes a "representative of the news media" and the requested records were not sought for commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(II).

## Defendant DHS's Response

44. On July 18, 2016, DHS's Privacy Office ("PRIV") sent a letter to Plaintiffs acknowledging receipt of Plaintiffs' Request. The letter did not include a determination as to whether DHS would comply with Plaintiffs' Request by producing agency records. *See* Exhibit B.

45. DHS denied Plaintiffs' request for expedited treatment, asserting that Plaintiffs do not qualify for expedited processing under 6 C.F.R. § 5.5(d)(1)(i) or 6 C.F.R. § 5.5(d)(1)(ii).

46. DHS conditionally granted Plaintiffs' request for a fee waiver, but denied Plaintiffs' request for designation as a representative of the news media in accordance with 6 C.F.R. § 5.11(b)(6) and 6 C.F.R. § 5.11(k)(2).

47. DHS informed Plaintiffs of the possibility of a delay in the process of the Request due to DHS receiving an increased number of FOIA requests. The normal statutory limit to respond to a Request is 20 business days, but FOIA permits a 10-day extension of the time period in "unusual" circumstances. 5 § U.S.C. § 552(a)(6)(B). DHS invoked the 10-day extension for Plaintiffs' Request pursuant to 5 U.S.C. § 552(a)(6)(B). However, no response followed from any component of DHS within ten days.

48. DHS referred Plaintiffs' Request to the Federal Emergency Management Agency (FEMA), Federal Law Enforcement Training Center (FLETC), Office of

Intelligence and Analysis (I&A) and National Protection and Programs Directorate (NPPD).

49. On August 23, 2016, Plaintiffs appealed DHS's decisions to deny expedited processing of the Request and to do no more than conditionally grant a fee waiver. 6 C.F.R. § 5.9(c). *See* Exhibit C.

50. On August 29, 2016, DHS acknowledged that it had received Plaintiffs' appeal of its decisions to deny expedited processing and conditionally permit a fee waiver. *See* Exhibit D.  However, DHS has thus far failed to respond to this appeal.

51. On September 27, 2016, Plaintiffs received a response (dated September 20, 2016) from the Office of Intelligence & Analysis ("OIA"), a component of DHS. OIA claimed that a search of its files revealed no records responsive to Plaintiffs' Request. *See* Exhibit E. The response is silent as to whether responsive records exist within any other DHS component.

52. On October 10, 2016, Plaintiffs filed an appeal of OIA's determination based on its failure to perform an adequate search for records and its improper reliance on FOIA exemptions to avoid searching for, or producing, responsive records. *See* Exhibit F.

53. On October 20, 2016, Plaintiffs received an acknowledgment from DHS regarding Plaintiffs' appeal of DHS-OIA's response of September 20, 2016. *See* Exhibit G.

54. Plaintiffs have received no other response or correspondence from any other component of DHS. With the exception of OIA, DHS has failed to make a determination about whether to comply with Plaintiffs' July 5, 2016, Request within the

30-day statutory time limit established by FOIA. 5 U.S.C. § 522(a)(6)(A)(i);

5 U.S.C. § 552(a)(6)(B); 6 C.F.R. § 5.5(a).

55.     Because DHS has both failed to respond to Plaintiffs' Request within the statutory timeframe and to respond expeditiously to Plaintiffs' Appeal, Plaintiffs are deemed to have exhausted their administrative remedies with respect to their Request to DHS. 5 U.S.C. § 522(a)(6)(C)(i); 6 C.F.R. § 5.5(a).

## Defendant FBI's Response

56.     In a letter dated July 28, 2016, the FBI acknowledged receipt of Plaintiffs' Request. The letter did not include a determination as to whether the FBI would comply with Plaintiffs' Request by producing agency records. *See* Exhibit H.

57.     The FBI granted Plaintiffs' request for expedited processing pursuant to 28 C.F.R. § 16.5(e)(1)(iv), but did not indicate whether processing had begun or when it would be complete. *See* Exhibit H.

58.     On September 20, 2016, Plaintiffs sent the FBI a letter requesting that the FBI notify Plaintiffs of when to expect to receive documents responsive to their Request. *See* Exhibit I.

59.     To date, Plaintiffs have received no further response or correspondence from the FBI.

60.     By purporting to grant Plaintiffs' request for expedited processing, but failing to respond to Plaintiffs' Request otherwise or to produce responsive documents, the FBI has failed to make a determination about Plaintiffs' Request within the 20-day statutory time limit established by FOIA. 5 U.S.C. § 522(a)(6)(A)(i); 28 C.F.R. § 16.5(e)(4).

61. Plaintiffs are therefore deemed to have exhausted their administrative remedies with respect to their Request to the FBI. 5 U.S.C. § 522(a)(6)(C)(i).

62. Plaintiffs have a statutory right to the records sought and there is no legal basis for Defendants' failure to disclose them in full.

63. Defendants must comply with their statutory obligations and release information to the public about the surveillance and monitoring of MBL in response to Plaintiffs' Request.

## FIRST CLAIM FOR RELIEF

**Defendants DHS and FBI Violated FOIA by Failing to
Produce Records Responsive to Plaintiffs' Request**

64. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 63 as if repeated and incorporated herein.

65. Defendants' failure to timely respond to the Plaintiffs' Request violated the Plaintiffs' rights under FOIA, 5 U.S.C. § 552(a)(6)(A), and Defendants' corresponding regulations.

66. Defendants' failure to promptly make records available in response to Plaintiffs' Request violated the Plaintiffs' rights under FOIA, 5 U.S.C. § 552(a)(3), and Defendants' corresponding regulations.

## SECOND CLAIM FOR RELIEF

**Defendant DHS Improperly Denied
Plaintiffs' Request for Expedited Processing**

67. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 63 as if repeated and incorporated herein.

68. By denying Plaintiffs' request for expedited processing, Defendant DHS violated Plaintiffs' rights under FOIA, 5 U.S.C. § 552(a)(6)(E) and 6 C.F.R. § 5.5(d)(1).

### THIRD CLAIM FOR RELIEF

**Defendant DHS Improperly Denied
Plaintiffs' Request for a Non-Conditional Fee Waiver**

69. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 63 as if repeated and incorporated herein.

70. By denying Plaintiffs' request for a non-conditional fee waiver, Defendant DHS violated Plaintiffs' rights under FOIA, 5 U.S.C. § 552(a)(4)(A)(iii) and 6 C.F.R. § 5.11(k).

### FOURTH CLAIM FOR RELIEF

**Defendant FBI Effectively Denied
Plaintiffs' Request for Expedited Processing**

71. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 63 as if repeated and incorporated herein.

72. By purporting to grant Plaintiffs' request for expedited processing, but failing to produce documents or even respond to Plaintiffs' request for a time frame for production, Defendant FBI violated Plaintiffs' rights under the FOIA, 5 U.S.C. § 552(a)(6)(E) and 28 C.F.R§ 16.5.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Order Defendants immediately to make a full, adequate search for the requested records;

B. Order Defendants to disclose the requested records in their entirety and make copies available to Plaintiffs no later than ten days after the Court's order, or in the alternative, order Defendants to engage in expedited processing of the Plaintiffs' Request;

C. Enjoin Defendants from charging Plaintiffs search, review, or duplication fees or costs for the processing of the FOIA Request;

D. Award Plaintiffs their costs and reasonable attorney's fees incurred in this action as provided by 5 U.S.C. § 552(a)(4)(E); and

E. Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

   /s/ Omar Farah
Omar Farah (OF-8886)
Ghita Schwarz (GS-9554)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 11201
(212) 614-6485
ofarah@ccrjustice.org

   /s/ Avidan Y. Cover
Avidan Y. Cover (AC-6478)
Katelyn Pierce, Legal Intern (pending authorization)
Galen Baynes, Legal Intern (pending authorization)
MILTON A. KRAMER LAW CLINIC CENTER
11075 East Boulevard
Cleveland, OH 44106
(216) 368-2766
ayc30@case.edu

DATED:        October 20, 2016