UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------
                                :

COLOR OF CHANGE, *et ano.*,        :

                                :        16cv8215

                 Plaintiffs,   :

                                :       <u>OPINION & ORDER</u>

            -against-        :

                                :

UNITED STATES DEPARTMENT OF   :
HOMELAND SECURITY, *et ano.*,   :

                                :

                 Defendants.   :

------------------------------------------

WILLIAM H. PAULEY III, Senior United States District Judge:

        Color of Change and the Center for Constitutional Rights (together, "Plaintiffs")

and the United States Department of Homeland Security ("DHS") bring dueling motions for

partial summary judgment in this Freedom of Information Act ("FOIA") lawsuit.  Plaintiffs seek

disclosure of eight draft versions of a never-finalized intelligence assessment, as well as a

portion of an e-mail regarding that assessment.  DHS contends the documents are protected

under FOIA Exemptions 3, 5, and 6.  For the reasons that follow, DHS's motion for partial

summary judgment is granted and Plaintiffs' motion for partial summary judgment is denied.

BACKGROUND

I.    <u>Facts</u>

        DHS's Intelligence & Analysis Office ("I&A") "gather[s] and share[s]

intelligence information in support of DHS's broader counterterrorism, homeland security, and

component-specific missions."  (See Declaration of Arthur R. Sepeta, ECF No. 60 ("Sepeta

Decl.") ¶ 7.)  As part of its mission, I&A "analyze[s] trends in terrorism affecting the United

States, including domestic terrorism."  (Sepeta Decl. ¶ 22.)

The documents that Plaintiffs seek are drafts of a proposed intelligence

assessment created by an I&A analyst and intern in the spring of 2017. (Sepeta Decl. ¶¶ 18–19,

22–23, 31.) The assessment was titled "(U\\FOUO) Growing Frequency of Race-Related

Domestic Terrorist Violence[1]," and it "contemplated a survey of violent, terroristic acts that were

driven by race-related extremist ideologies of varying stripes in order to assess developing trends

in this space." (Sepeta Decl. ¶¶ 22–23.) Most of the drafts contain comments and edits. (Sepeta

Decl. ¶ 31.) No version was ever finalized or adopted. (Sepeta Decl. ¶ 32.) Rather, after going

through the preliminary steps of I&A's editorial review process, the agency chose to abandon the

assessment. (Sepeta Decl. ¶ 32.)

II.      Procedural History

In July 2016, Plaintiffs submitted a FOIA request to both DHS and the Federal

Bureau of Investigation ("FBI")[2] seeking documents related to government surveillance and

monitoring of the Movement for Black Lives ("MBL"). (See Sepeta Decl., Ex. A, at 1.) DHS

referred the request to I&A. (Sepeta Decl. ¶ 12 & Ex. B.) In September 2016, DHS informed

Plaintiffs that it had located no responsive documents. (Sepeta Decl. ¶ 13 & Ex. C.)

In October 2016, after administratively appealing DHS's determination, Plaintiffs

filed this action. (Compl. ¶ 10.) In April 2017, based on the parties' agreement, this Court

entered a scheduling order directing I&A to process or produce 500 pages of documents

responsive to Plaintiffs' request per month. (Amended Scheduling Order, ECF No. 28.) The

parties worked in good faith to resolve this action, and I&A made six rounds of productions.

(Sepeta Decl. ¶ 17.)

---

[1] "(U\\FOUO)" stands for "Unclassified \\ For Official Use Only." The first draft was titled "(U\\FOUO) Race-Related Domestic Terrorism Incidents Likely to Continue in 2017." (Sepeta Decl. ¶ 22.)

[2] The FBI is not implicated in these motions.

In January 2018, the parties informed this Court that nearly all production issues had been resolved except for I&A's withholding of the documents subject to this motion. (See January 25, 2018 Hearing Transcript, ECF No. 48, at 3:19–25.) DHS produced the drafts in fully redacted form. (Sepeta Decl. ¶ 19.) DHS also withheld a portion of a March 3, 2017 email sent by a senior analyst to the paper's authors providing feedback and attaching an edited draft. (Sepeta Decl. ¶ 25.) Through other documents that DHS produced, Plaintiffs learned that this assessment had been referred to internally as the "Race Paper," and therefore believed it may contain information relevant to their request.

In connection with its motion for partial summary judgment, DHS provided a Vaughn declaration prepared by Arthur R. Sepeta, Chief of the Privacy and Intelligence Oversight Branch of I&A. (See generally Sepeta Decl.) Sepeta oversees I&A's FOIA responses. (Sepeta Decl. ¶ 3.) After oral argument, this Court also reviewed the disputed documents in camera. (See Memorandum & Order, ECF No. 64.)

DHS asserts that three FOIA exemptions protect production: (1) Exemption 5, as to all materials, (2) Exemption 3, as to portions of the materials, and (3) Exemption 6, as to names of I&A employees. Plaintiffs counter that DHS fails to show these exemptions apply and that this Court should order release of any segregable portions of the documents. As discussed below, Exemption 5 fully protects the documents Plaintiffs seek. Accordingly, this Court does not reach the other Exemptions.

## LEGAL STANDARD

FOIA actions are typically resolved through summary judgment. N.Y. Times v. U.S. Dep't of Justice, 101 F. Supp. 3d 310, 317 (S.D.N.Y. 2015). The agency bears the burden to defend its non-disclosure. Main St. Legal Servs. v. Nat'l Sec. Council, 811 F.3d 542, 544 (2d

Cir. 2016).  A district court reviews an agency's FOIA determinations de novo, N.Y. Times Co.

v. U.S. Dep't of Labor, 340 F. Supp. 2d 394, 400 (S.D.N.Y. 2004), and resolves all doubts in

favor of disclosure, Assoc. Press v. U.S. Dep't of Defense, 554 F.3d 274, 283 (2d Cir. 2009).

FOIA enumerates nine exemptions.  See 5 U.S.C. § 552(b).  They are construed narrowly, as

"disclosure, not secrecy, is the dominant objective of the Act."  Dep't of Air Force v. Rose, 425

U.S. 352, 361 (1976).

   "Affidavits or declarations supplying facts indicating that the agency has

conducted a thorough search and given reasonably detailed explanations why any withheld

documents fall within an exception are sufficient to sustain the agency's burden."  Carney v.

U.S. Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994).  "An agency's justification for invoking a

FOIA exemption is sufficient if it appears logical or plausible" and is "not controverted by either

contrary evidence in the record nor by evidence of agency bad faith."  Wilner v. Nat'l Sec.

Agency, 592 F.3d 60, 73 (2d Cir. 2009) (citation and marks omitted).

   "Even if portions of documents are exempt from disclosure, [FOIA] requires the

Government to disclose '[a]ny reasonably segregable portion.'"  ACLU v. FBI, 2015 WL

1566775, at *2 (S.D.N.Y. Mar. 31, 2015) (citing 5 U.S.C. § 552(b)).  However, non-exempt

portions need not be produced if "they are inextricably intertwined with exempt portions."

Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1116 (D.C. Cir. 2007) (citation omitted).

DISCUSSION

I.   Exemption 5

   DHS contends the documents at issue are protected under Exemption 5 as they

"contain information relating to intra-agency pre-decisional deliberations, including preliminary

evaluations and recommendations of I&A personnel."  (Sepeta Decl. ¶ 26.)  FOIA Exemption 5

4

allows withholding of "inter-agency or intra-agency memorandums or letters that would not be available by law to a party." 5 U.S.C. § 552(b)(5). One of the privileges this exemption covers is the "deliberative process privilege, a sub-species of work-product privilege that covers documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." Tigue v. U.S. Dep't of Justice, 312 F.3d 70, 76 (2d Cir. 2002) (citation omitted). The deliberative process privilege is meant to protect "the decisionmaking processes of the executive branch in order to safeguard the quality and integrity of governmental decisions." Hopkins v. U.S. Dep't of Hous. & Urban Dev., 929 F.2d 81, 84 (2d Cir. 1991).

The privilege has two requirements: the document "must be both 'predecisional' and 'deliberative.'" Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 482 (2d Cir. 1999). "A document is predecisional when it is prepared in order to assist an agency decisionmaker in arriving at his decision," such as "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." Grand Cent. P'ship, 166 F.3d at 482 (citations and marks omitted). A court considers if the "document precedes, in temporal sequence, the decision to which it relates." Seife v. U.S. Dep't of State, 298 F. Supp. 3d 592, 614 (S.D.N.Y. 2018) (citation omitted).

A document is deliberative when it is "actually related to the process by which policies are formulated." Hopkins, 929 F.2d at 84 (citation and alterations omitted). Accordingly, the privilege does not protect "a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment." Citizens Union of City of N.Y. v. Attorney Gen. of N.Y., 269 F. Supp. 3d 124, 158

5

(S.D.N.Y. 2017).  Additionally, courts consider if the document "formed an essential link in a specified consultative process" and "if released, would inaccurately reflect or prematurely disclose the views of the agency."  Seife, 298 F. Supp. 3d at 614 (citation and marks omitted).

According to Sepeta, the drafts at issue were a "proposed intelligence assessment that was never finalized or disseminated outside of I&A."  (Sepeta Decl. ¶ 27.)  They were created by staff without "final decision-making authority for [DHS]," meaning release would "expose the exchange of ideas and suggestions that accompany I&A's . . . preliminary assessments."  (Sepeta Decl. ¶¶ 31, 33.)  After they were drafted, the documents "only went through part of I&A's editorial review process and w[ere] not close to finalization" before being terminated.  (Sepeta Decl. ¶ 32.)

Regarding whether they are deliberative, Sepeta represents that papers such as these are "broadly disseminated [by I&A] to inform policy decisions, threat prioritization, and resource planning and allocation" among various policymakers, and provide guidance for "DHS actions and intelligence collection efforts against violent extremist actors."  (Sepeta Decl. ¶ 30.) The withheld portion of the March 3 email provided a senior analyst's "candid feedback" and suggested revisions to the paper's authors.  (Sepeta Decl. ¶¶ 25, 38.)

Based on that description and this Court's in camera review, Exemption 5 protects these documents.  "It is well-settled that draft documents, by their very nature, are typically predecisional and deliberative.  They reflect only the tentative view of their authors; views that might be altered or rejected upon further deliberation by their authors or by their superiors." Amnesty Int'l USA v. CIA, 728 F. Supp. 2d 479, 518 (S.D.N.Y. 2010) (citation omitted); see Nat'l Council of La Raza v. Dep't of Justice, 339 F. Supp. 2d 572, 583 (S.D.N.Y. 2004) ("Drafts and comments on documents are quintessentially predecisional and deliberative."); NAACP

Legal Def. & Educ. Fund, Inc. v. U.S. Dep't of Hous. & Urban Dev., 2007 WL 4233008, at *11

(S.D.N.Y. Nov. 30, 2007) (same).

These papers, prepared by an analyst and intern, reflect the preliminary processes

through which DHS policy is created. Release would reveal the give-and-take through which

agencies ultimately reach their positions. It would display I&A's internal considerations on

whether to issue the assessment and what form it should take. Therefore, release "might mislead

the public as to [the agency's] reasoning, which it is entitled to keep private in the spirit of free

discussion in the policy-making process." Robert v. Dep't of Health & Human Servs., 2005 WL

1861755, at *4 (E.D.N.Y. Aug. 1, 2005).

Similarly, the March 3 email provided guidance on how to alter the proposed

assessment, including recommendations for other information to include. It was therefore

predecisional, in that it reflects initial discussions preceding a final paper, and deliberative, in

that it reflects the process through which policy papers are created. See N.Y. Times Co. v. U.S.

Dep't of Defense, 499 F. Supp. 2d 501, 515 (S.D.N.Y. 2007) (email was predecisional and

deliberative as it "comment[ed] on a draft . . . paper and raise[d] a possible issue to be

considered") (citation and marks omitted); La Raza, 339 F. Supp. 2d at 584 (email exchange

regarding draft was protected as it showed "comments produced and exchanged before a final

[document] is released"); cf. MacNamara v. City of N.Y., 249 F.R.D. 70, 85 (S.D.N.Y. 2008)

(ordering production of emails concerning "routine operating decisions rather than policy

oriented judgments") (marks and alterations omitted).

Plaintiffs contend that DHS fails to pinpoint a decision or policy to which the

papers contributed. But an agency need not "identify a specific decision in connection with

which a memorandum is prepared." NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 151 n.18

(1975); see Tigue, 312 F.3d at 80 ("[T]he fact that the government does not point to a specific decision made by [the agency] does not alter the fact that the Memorandum was prepared to assist [the agency's] decisionmaking on a specific issue."). Rather, agencies are perennially "engaged in a continuing process of examining their policies," which requires "generat[ing] memoranda containing recommendations which do not ripen into agency decisions; and the lower courts should be wary of interfering with this process." Sears, Roebuck & Co., 421 U.S. at 151 n.18. Sepeta explains that reports like these are created to be "broadly disseminated to inform policy decisions," which show they are deliberative. (See Sepeta Decl. ¶ 30.)

Plaintiffs also maintain that the last version of the draft paper became "final," making it no longer predecisional. This contention has been rejected by both the Second and D.C. Circuits. "There may be no final agency document because a draft died on the vine. But the draft is still a draft and thus still pre-decisional and deliberative." Nat'l Sec. Archive v. CIA, 752 F.3d 460, 463 (D.C. Cir. 2014) ("A privilege contingent on later events—such as whether the draft ultimately evolved into a final agency position—would be an uncertain privilege [and] little better than no privilege at all.") (citation and marks omitted); see also ACLU v. U.S. Dep't of Justice, 844 F.3d 126, 133 (2d Cir. 2016) (even though document was "never published," it was still a "draft and for that reason predecisonal"); Nat. Res. Def. Council, Inc. v. Nat'l Marine Fisheries Serv., 409 F.Supp.2d 379, 384 (S.D.N.Y. 2006) (same).

Indeed, Plaintiffs' conflation of a "final" draft with a final agency assessment poses the very risk that the deliberative process privilege is meant to protect against—public confusion over agency official policy, which may chill frank and candid discussion among government employees. See Russell v. Dep't of Air Force, 682 F.2d 1045, 1049 (D.C. Cir.

1982) (recognizing "the tendency of the public to assume that a memorandum generated within an agency . . . reflects the position of the agency").

II.     Segregability

Under FOIA, this Court must ensure no reasonably segregable portions of the documents can be produced. See 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person . . . after deletion of the portions which are exempt under this subjection.") A "district court must make specific findings of segregability regarding the documents to be withheld." Sussman, 494 F.3d at 1116; see also Hopkins, 929 F.2d at 85–86 (remanding case for consideration on whether factual data "could reasonably be segregated from the privileged material").

Exemption 5 "does not . . . as a general matter, cover 'purely factual' material." Grand Cent. P'ship, 166 F.3d at 482. But "[w]here . . . disclosure of even purely factual material would reveal an agency's decision-making process Exemption (b)(5) applies." Russell, 682 F.2d at 1048. This occurs "where factual information is intertwined with deliberative policy discussions," such that disclosure of factual portions would show "the protected deliberations." ACLU v. Dep't of Defense, 2017 WL 4326524, at *7 (S.D.N.Y. Sept. 27, 2017).

The drafts at issue contain factual information—namely, references to and descriptions of domestic terrorism incidents. The paper's authors use those events to support and provide examples for the conclusions they reach. DHS contends that these facts still show "which data [I&A chose] to include or remove during the drafting process and how to weigh that data." (Sepeta Decl. ¶ 34.)

After reviewing the documents, this Court agrees. Even the factual portions of the drafts demonstrate DHS's deliberative process. They show the authors' judgment in

"cull[ing] the relevant documents, extract[ing] pertinent facts, [and] organiz[ing] them to suit a specific purpose." See Nat'l Sec. Archive, 752 F.3d at 465 (citation omitted). The factual materials do not exist in a vacuum. Rather, they are interwoven with the papers' policy judgments. Therefore, release would reveal the process by which "factual material was assembled through an exercise of judgment in extracting pertinent material from a vast number of documents for the benefit of an official called upon to take discretionary action." Mapother v. Dep't of Justice, 3 F.3d 1533, 1539 (D.C. Cir. 1993); see also Competitive Enter. Inst. v. Office of Sci. & Tech. Policy, 161 F. Supp. 3d 120, 132 (D.D.C. 2016) (holding factual portions of letter would reveal "editorial judgments").

As multiple courts have recognized, the factual/deliberative divide is not always black and white. Instead, "the key question . . . [is] whether the disclosure of materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." Dudman Commc'ns Corp. v. Dep't of Air Force, 815 F.2d 1565, 1568 (D.C. Cir. 1987). Here, the factual portions may have originated from public sources. But an analyst and intern compiled and arranged those materials to support the positions they espoused. In such an amalgam, the factual portions of the drafts at issue are equally deliberative. Cf. Lead Indus. Ass'n, Inc. v. Occupational Safety & Health Admin., 610 F.2d 70, 83 (2d Cir. 1979) (denying release of summaries prepared in agency rule making process as the drafters "were asked to draw inferences and weigh . . . evidence").

Plaintiffs allude to the possibility that this Court only order release of the factual portions of the final iteration of the paper, contending this would not show which facts were added or removed during the drafting process. But this would still show the authors'

determinations of which facts were worthy of inclusion, regardless of what was included in earlier drafts.

Plaintiffs also contend that this reading of segregability threatens to swallow the rule, meaning that an agency will always contend that segregable factual data displays its editorial judgments. However, there are certain situations where a factual narrative would not reveal editorial judgments. See Mapother, 3 F.3d at 1539 (denying privilege to section of report that was "in substance an inventory, presented in chronological order"); Leopold v. CIA, 89 F. Supp. 3d 12, 22 (D.D.C. 2015) ("Straightforward, mechanical recitations of fact . . . will generally fall outside of the privilege."). That is not the case here, where "the facts are so intertwined with a policy recommendation and thereby embody the judgment of its author." Shinnecock Indian Nation v. Kempthorne, 652 F. Supp. 2d 345, 371 (E.D.N.Y. 2009); see Bishop v. U.S. DHS, 45 F. Supp. 3d 380 (S.D.N.Y. 2014) (disclosure would "implicitly suggest [what] factors played a role in [agency's] analysis"). Ultimately, Plaintiffs voice a valid concern, but that concern fails to outweigh the case law supporting DHS's position.

III.    *Vaughn* Declaration

Initially, Plaintiffs asserted that DHS's Vaughn index was deficient. (See Declaration of Omar Farah in Support of Plaintiffs' Motion for Summary Judgment, ECF No. 56, Ex. 8.) In the wake of the Sepeta Declaration, Plaintiffs appear to abandon that argument. Nevertheless, to the extent that Plaintiffs contend the Sepeta Declaration is deficient, this Court holds that it satisfies DHS's burden to provide "a relatively detailed analysis of the withheld material in manageable segments without resort to conclusory and generalized allegations of exemptions." Halpern v. FBI, 181 F.3d 279, 290 (2d Cir. 1999) (citing Vaughn v. Rosen, 484 F.2d 820, 826 (D.C. Cir. 1973)) (marks and alterations omitted).

CONCLUSION

For the foregoing reasons, DHS's motion for partial summary judgment is granted and Plaintiffs' motion for partial summary judgment is denied. The Clerk of Court is directed to terminate the motions pending at ECF Nos. 54 and 58. The parties are directed to submit a joint status report by August 8, 2018.


Dated: July 9, 2018
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.